UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
OVERSEAS PRIVATE INVESTMENT CORPORATION,

                              ECF CASE

                  Plaintiff,

                           Civ. No. 12 cv 5833 (RA)

          -against-

PETER EUGENE GERWE,

                  Defendant.
------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS.

**Page**

Table of Authorities ...................................................................................ii

I.      PRELIMINARY STATEMENT  ...............................................................1

II.     STATEMENT OF FACTS......................................................................3

III.    ARGUMENT.....................................................................................10

   A. Standard Of Review...........................................................................10

   B. OPIC Violated The Duty Of Good Faith And Fair Dealing............................11

   C. Waivers Contained in the Guaranty Do Not License OPIC to Prevent Repayment
      Of The Loan - Mr. Gerwe is Entitled to Summary Judgment ...........................16

IV.     CONCLUSION.....................................................................................23

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

511 West 232nd Owners Corp. v. Jennifer Realty Co.,
98 N.Y.2d 144, 153 (2002)………….…………………………………………………...21

Amnesty Am. V. Town of W. Hartford,
361 F.3d 113, 122 (2d Cir. 2004)……………………………………………………..10

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)……..............................10

Ashland Mgmt. Inc. v. Janien,
82 N.Y.2d 395, 402 (1993)..………………………………………………………… 22

Bank of China v. Chan,
937 F.2d 780, 788-9 (2d Cir. 1991)…………………………………………..14, 17, 18, 19, 22

Bank of New York v. Spring Glen Associates,
222 A.D.2d 992 (3rd Dep't 1995)………………………………………………………16, 20

Banque Nationale De Paris S.A.-Dublin Branch v. Ins. Co. of N. America,
896 F.Supp. 163, 164-5 (S.D.N.Y. 1995)…………………………..…………………....14

Barclays Bank of New York, N.A. v. Heady Electric Co.,
174 A.D.2d 963, 966 (3rd Dep't 1991)…………………………………………………...18, 20

Burtnieks v. City of New York,
716 F.2d 982, 983-4 (2d Cir. 1983)……………………..………………………………...10

Cable Science Corp. v. Rochdale Village, Inc.,
920 F.2d 147, 151 (2d Cir. 1990)………………………………………………………10

Canterbury Realty & Equip. Corp. v. Poughkeepsie Savings Bank,
135 A.D.2d 102, 107-108, 524 N.Y.S.2d 531, 535 (3rd Dep't 1988) ……………….............15, 18

Carvel Corp. v. Diversified Management Group, Inc.,
930 F.2d 228, 231 (2d Cir. 1991)………………………………………………….............12

Celotex. v. Catrett,
477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986)……………………………………………10, 11

Cross & Cross Properties, Ltd. v. Everett Allied Company,
886 F.2d 497, 502 (2d Cir. 1989) …..……………………………………………12, 22

Dalton v. Educational Testing Serv.,
87 N.Y.2d 384, 389 (1995)..............................................................11, 12, 14, 15, 21

Faufhnan v. Big Apple Car Serv.,
828 F.Supp. 155, 160 (E.D.N.Y. 1993).............................................................11

FDIC v. Wrapwell Corp.,
922 F. Supp. 913 (S.D.N.Y. 1996)................................................................17, 19

Filner v. Shapiro,
633 F.2d 139, 143 (2d Cir. 1980)..................................................................14

Havel v. Kelsey-Hayes Co.,
83 A.D.2d 380, 384, 445 N.Y.S.2d 333 (4th Dept. 1981)..............................................14

Indu Craft Inc. v. Bank of Baroda,
87 F.3d 614, 616 (2d Cir. 1996) ................................................................22

Goodstein Construction v. City of New York,
67 N.Y.2d 990, 991-2 (1986).................................................................21

Manufacturers & Traders Trust Co. v. Sullivan,
188 A.D.2d 1023 (4th Dep't 1992)...........................................................18, 20

Nassau Trust Co. v. Montrose Concrete Products Corp.,
56 N.Y.2d 175, 186 (1982)................................................................17, 21

National Westminster Bank USA v. Ross,
676 F. Supp. 48 (S.D.N.Y. 1987).............................................................15

River Bank America v. Daniel Equities Corp.,
 213 A.D.2d 929, 931  (3rd Dep't 1995).......................................................16

Sterling Nat'l Bank v. Longa,
No. 99 CIV. 8978 (TPG), 2000 WL 1341449 (S.D.N.Y. 2000)...........................14, 17-18

Taggart v. Time Inc.,
924 F2d 43, 46 (2d Cir. 1991)..............................................................10

Travelers International AG v. Trans World Airlines, Inc.,
41 F.3d 1570, 1575 (2d Cir. 1994)..........................................................11, 12

United States v. Diebold, Inc.,
369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)......................................10

<u>Vanadium Corp. of Am. v. Fidelity & Deposit Co. of Maryland,</u>
159 F.2d 105, 108 (2d Cir. 1947)..............................................................................15

<u>Wieder v. Skala,</u>
80 N.Y.2d 628, 637 (1992)......................................................................................21

<u>Williams v. Brooklyn Union Gas Co.,</u>
819 F. Supp. 214, 224 (E.D.N.Y. 1993)...................................................................11

## Statutes

Federal Rules of Civil Procedure 56 ....................................................................10

Restatement (Second) Contracts § 205............................................................14, 22

New York. Uniform Commercial Code 9-610(b).................................................18, 19

Defendant, Peter Eugene Gerwe, through his attorneys, Eaton & Van Winkle LLP, respectfully submits this Memorandum Of Law In Support of Defendant's Motion For Summary Judgment.

## I.   PRELIMINARY STATEMENT

This is an action on a guaranty. The Plaintiff has blocked the principal debtor's efforts and ability to repay the subject loan.  By preventing repayment, the Overseas Private Investment Corporation ("OPIC") forfeited and discharged the guaranty.

The guaranty is contained in a "Project Completion Agreement" (the "PCA") among Closed Joint Stock Company "Star Networks" ("StarNet"), a Russian internet service provider, Bressar Holdings Limited ("Bressar"), StarNet's parent company, Mr. Gerwe and OPIC dated as of October 1, 2009.

The guaranty relates to a Loan Agreement between OPIC and StarNet dated September 9, 2009 (the "Loan Agreement"), pursuant to which OPIC was to lend StarNet a total of $28,000,000.   The Loan Agreement was the result of a re-negotiation and expansion of an earlier, smaller, OPIC/StarNet Loan Agreement for $2,000,000 which was concluded on February 16, 2005, and amended on September 9, 2005, October 14, 2005 and January 31, 2006.  Mr. Gerwe was not a party to the Loan Agreement.  Under the terms of the Loan Agreement, OPIC agreed to loan StarNet up to $28 million over a 27-month period, beginning with an initial $9 million advance on October 2, 2009.  The purpose of the $28 million loan was to attract additional investors, thereby expanding its Internet service business to achieve the "Project Completion" under the PCA to which Mr. Gerwe <u>was</u> a party.  His guaranty was limited to $5 million.

This Court has previously determined that OPIC's refusal to consent to a shareholder restructuring, which could have permitted Mr. Gerwe to sell StarNet, may constitute a defense to repayment of the subject guaranty. It was on this basis that the Court denied OPIC's motion for summary judgment on March 7, 2014, and ordered discovery on the issue.

Discovery of OPIC's witnesses and documents has established that not only did OPIC refuse to consent to a shareholder restructuring which could have permitted Mr. Gerwe to sell StarNet, and that its actions prevented repayment of the loan. Pursuant to the Sponsor's Stock Pledge And Share Retention Agreement dated October 5, 2009, between the shareholders of StarNet, as Pledgors, and OPIC, as Pledgee (the "Stock Pledge Agreement") – not part of the record on OPIC's prior motion for summary judgment – the shares of Bressar, StarNet's parent company, were pledged as collateral for the loan. However, after declaring the loan to be in default OPIC did not seek to sell the shares of Bressar.

Accordingly, Mr. Gerwe proposed to cause StarNet to repay the indebtedness by selling the Bressar stock, held as collateral by OPIC, to MTS, a third party purchaser. Under the terms of the Stock Pledge agreement OPIC's consent was necessary to buy out the minority shareholders of Bressar. OPIC refused to give consent, thereby preventing the sale and extinguishing the primary obligation which gave rise to his liability under the guaranty. With sale impossible, and OPIC's failure to sell its collateral, the primary obligation of StarNet could not be repaid. OPIC's pursuit of the limited guaranty is spurious.

Discovery disclosed that OPIC did not assess the valuation of StarNet, nor any cost of restructuring. Instead, OPIC chose to demand that Mr. Gerwe pay his guaranty of $5,000,000 pay his guaranty of $5,000,000 without any consideration of the proposed restructuring. Clearly a sale of StarNet would have resulted in repayment of the loan proceeds. OPIC's demands bypassed any legitimate analysis of the situation. OPIC undertook a course of action that was detrimental not only to Mr. Gerwe, but also to itself. OPIC refused to conduct any independent valuation of StarNet until after commencement of litigation.

In blocking repayment of the loan, OPIC violated its duty of good faith and fair dealing which is integral to each and every contract under New York law. This breach, which made repayment of the loan impossible, discharges the guaranty. Accordingly, as will be demonstrated in further detail below, Mr. Gerwe is entitled to summary judgment dismissing OPIC's complaint.

## II.    STATEMENT OF FACTS

The relevant facts are more fully set forth in the accompanying Declaration of Peter Eugene Gerwe ("Gerwe S.J. Decl."), Defendant's Statement Pursuant To Local Rule 56.1 ("R. 56.1 Statement") and the exhibits annexed to the Declaration of Adam J. Rader, Esq. ("Rader S.J. Decl.").

## BACKGROUND INFORMATION

OPIC made a commitment to lend a total of $28,000,000 to Russian Closed Joint Stock Company StarNet, a Russian internet service provider located in Moscow, Russia pursuant to a Loan Agreement dated September 2, 2009, (the "Loan Agreement") and a Project Completion Agreement dated October 1, 2009 (the "PCA"). The Loan Agreement was the result of a re-negotiation and expansion of the

first OPIC/StarNet Loan Agreement for $2,000,000 which was concluded on February 16, 2005 and amended on September 9, 2005, October 14, 2005 and January 31, 2006. See September 2, 2009 Loan Agreement (Rader S.J. Decl., Ex. A) and PCA (Rader S.J. Decl., Ex. C).

The shares of Bressar were pledged as collateral for the loan to pursuant to the Stock Pledge Agreement. See Stock Pledge Agreement (Rader S.J. Decl., Ex. E). As principal shareholder of StarNet, Gerwe ("Defendant") provided his limited guaranty pursuant to the PCA. The guaranty was capped at $5,000,000. See PCA, (Rader S.J. Decl. Ex. C).

## MR. GERWE PREVIOUSLY ADVISED OPIC OF THE PLAN TO SELL THE COMPANY SO THAT OPIC WOULD BE FULLY REPAID

By December of 2011, Mr. Gerwe advised OPIC that the best course of action would be to sell StarNet. On December 22, 2011, Mr. Gerwe sent an email to OPIC representatives Steven Smith, Eric Johnson and David Schmitzer. ("*** [o]ur best plan now is to sell the entire company in 2012 and 2013 and repay the OPIC loan in its entirety.") See December 22, 2011 email from Peter Gerwe to Steven Smith, Eric Johnson and David Schmitzer (Rader S.J. Decl., Ex. 11).

David Schmitzer left OPIC and was replaced by Deborah Moronese as the portfolio manager for the OPIC/StarNet project. Gerwe S.J. Decl., ¶ 6; July 24, 2014 Deposition Transcript of Deborah Moronese, pp. 8-12 (Rader S.J. Decl., Ex. N). The major consequence of her arrival on the scene was her hostility to the project and to Mr. Gerwe personally.

The Stock Pledge Agreement granted OPIC the right to sell the shares of Bressar, StarNet's parent, in order to secure the repayment of StarNet's indebtedness.

Since OPIC did not exercise that right, Mr. Gerwe proposed a sale of the shares of Bressar himself, and to use the proceeds to repay the entire indebtedness. This made sense as Mr. Gerwe had an affiliation with Mobile Telesystems ("MTS") – a well-funded Russian telecommunications company interested in purchasing the Bressar stock. As a result, Mr. Gerwe was in the best position to achieve the maximum sale price and to procure a valuation of StarNet. Mr. Gerwe obtained an approximate valuation range of $9 million to $12 million and identified MTS as a proposed buyer. See, Gerwe Decl., ¶ ¶ 13-15; 23-29.

## OPIC'S IRRATIONAL BIAS AND CONCEALED INTENTION TO BRING LEGAL ACTION DOOMED ANY SALE

Upon assuming the role of portfolio manager of the OPIC/StarNet project, Ms. Moronese "determined" that Mr. Gerwe was a "spoiled child." She reached this conclusion during her very first telephone conversation with Mr. Gerwe in March of 2012. See July 24, 2014 Deposition Transcript of Deborah Moronese, p. 38 (Rader S.J. Decl., Ex. N); July 25, 2014 Deposition Transcript of Deborah Moronese, p. 75 (Rader S.J. Decl., Ex. P). This irrational bias prevented Ms. Moronese, and the OPIC "project team" of which she was a member, from giving consideration to Mr. Gerwe's proposal to eliminate StarNet's indebtedness.

On or about April 25, 2012, Mr. Gerwe participated in a telephone conference with Ms. Moronese and Eric Johnson of OPIC. During that telephone conference Ms. Moronese and Mr. Johnson asked Mr. Gerwe to provide information to show how he was reaching a valuation of $9 million to $12 million. However, after the telephone conference Ms. Moronese sent Steven Smith a secret summary of the conference in which she wrote that she and Eric Johnson had decided to pursue litigation against Mr. Gerwe, rather than wait for substantiation of his valuation. Ms. Moronese wrote,

in relevant part:

> **POST-CALL: Eric and I agree to pursue litigation and not wait.**
> **For this, we will need to complete a WAP for transfer to GRG for**
> **them to pursue litigation on the Sponsor.**

See April 25, 2012 email from Deborah Moronese to Steven Smith and Eric

Johnson (Rader S.J. Decl., Ex. Q).

## THE STARNET VALVATION FELL ON DEAF EARS AND CLOSED MINDS

OPIC's April 25, 2012 decision to pursue litigation against Mr. Gerwe, "and

not wait," was concealed from Mr. Gerwe. Through the court-ordered discovery

process in this action, OPIC revealed its secret plan to thwart the sale of StarNet. It

simply did not matter to OPIC what Mr. Gerwe proposed. See Gerwe S.J. Decl., ¶¶

21 and 33.

Unaware of OPIC's intentions, and proceeding in good faith, Mr. Gerwe

provided substantiation for valuing StarNet in the range of $9 million to $12.8 million

in the form of two memoranda from Sergey Kalenikhin to Mr. Gerwe, which

confirmed Mr. Gerwe's prior valuation. These memoranda were provided on April

29, 2012 and April 30, 2012, less than a week after OPIC had requested them during

the April 25, conference call between Mr. Gerwe, Ms. Moronese and Mr. Johnson.

See Gerwe Decl., ¶¶ 23-27.

OPIC, having already decided to pursue a strategy of litigation, disregarded

the substantiation for Mr. Gerwe's valuation. OPIC rejected Mr. Gerwe's valuation

without doing any due diligence of its own and, consistent with its deception, without

obtaining its own valuation. Indeed, OPIC acknowledges that although its Workout

Action Plan ("WAP") set forth the need for an independent valuation of the debtor

company, <u>OPIC did not retain a company</u> to prepare a valuation until <u>after</u> this action was filed. <u>See</u> December 2, 2014 Affidavit of Steven Smith (Rader S.J. Decl., Ex. O). OPIC did not obtain its valuation of StarNet until on or about January 23, 2013 [<u>Id.</u>], long after it had arbitrarily rejected Mr. Gerwe's valuation. By that time the belated valuation was irrelevant as circumstances had changed and OPIC's actions had diminished the value of StarNet -- the collateral for the loan -- by preventing the sale of the company to MTS. <u>See</u> Gerwe S.J. Declaration, ¶ 28. OPIC's behavior is bizarre in light of the fact that it was holding the Bressar shares as collateral.

**THE PROPOSED SHAREHOLDER RESTRUCTURE**

As discussions with MTS progressed it became apparent that, in order to proceed with the sale of StarNet to MTS, Mr. Gerwe would have to buy out the interests of the minority shareholders (the "shareholder restructure"). Mr. Gerwe informed OPIC, that he needed to purchase the minority shareholders' interests for two distinct reasons: i) the minority shareholders were opposed to any sale, and would block any sale, unless their interests were bought out beforehand ; and ii) MTS was insistent that it would only purchase a company in which Mr. Gerwe was a sole shareholder.[1] <u>See</u> Gerwe S.J. Declaration, ¶¶ 16-20. Mr. Gerwe also informed OPIC that he had reached an agreement for the purchase of the minority shareholders' interests for a *de minimis* sum. Mr. Gerwe asked OPIC for its approval of the shareholder restructure, as he was required to do pursuant to the Stock Pledge Agreement. <u>See</u> Gerwe S.J. Decl., ¶¶ 12, 16-20. However, OPIC flatly rejected Mr. Gerwe's numerous requests for OPIC's consent to the shareholder restructure. OPIC

---

[1] MTS did not want to engage in the costly and extensive due diligence which have been required with respect to the minority shareholders. MTS is a publicly listed company and such due diligence would have been required for a number of reasons, including but not limited to assuring MTS' compliance with the Foreign Corrupt Practices Act.

made it clear on numerous occasions in June, July and August, 2012 that <u>no</u>

shareholder restructure would be considered -- no matter how low the cost Mr. Gerwe

had to pay for the minority shares – unless and until Mr. Gerwe paid OPIC

$5,000,000 pursuant to his guaranty. <u>See</u> Gerwe S.J. Decl., ¶ 18; <u>see also</u> June 19,

2012 email chain between Peter Gerwe and Deborah Moronese (Rader S.J. Decl.,

Ex.G), July 9, 2012 email chain between Peter Gerwe and OPIC (Rader S.J. Decl.,

Ex. H) and August 16, 2012 email chain between Peter Gerwe and Deborah Moronese

(Rader S.J. Decl., Ex. R).  The record is clear that this extortionate position was

"ostrich-like" in its disregard of valuation, the security OPIC held, and the

opportunity for repayment.

### OPIC's LACK OF DUE DILIGENCE

OPIC's decision to reject the shareholder restructure was made without OPIC

obtaining any independent valuation of StarNet and without any attempt by OPIC to

determine the viability of the proposed sale to MTS.  Mr. Gerwe advised OPIC that he

could sell StarNet to MTS for a sum which would result in repayment of StarNet's

indebtedness to OPIC.  These statements were backed up by the credibility of the

financial valuation from Sergey Kalenikhin which Mr. Gerwe supplied to OPIC.  Mr.

Kalenikhin is a qualified financial analyst with a high degree of expertise in matters

involving Russian Telecom, Media and Technology.  His memoranda established that

the sale of StarNet to MTS could result in repayment of most, if not all, of StarNet's

indebtedness to OPIC.  Yet, OPIC disregarded Mr. Kalenikhin's analysis never

seeking to obtain its own valuation, until too late – after suit.  Effectively OPIC did

what it could to impair the security it held. <u>See</u> Gerwe S.J. Decl., ¶¶ 23-32.

**OPIC PREVENTED REPAYMENT OF STARNET'S INDEBTEDNESS**

Mr. Gerwe's representations to OPIC concerning his ability to consummate a sale with MTS should have been accorded inherent credibility in view of Mr. Gerwe's affiliation with MTS. Mr. Gerwe was the CEO of Sistema Mass-Media whose parent company, Sistema Group was also the parent of MTS. See Gerwe S.J. Decl., ¶¶ 14-15. If Mr. Gerwe's relationship to MTS was not enough to get OPIC to consider approving of the shareholder restructure needed to proceed with the sale of StarNet to MTS, StarNet could have met with MTS. Such a meeting would have allowed StarNet to assess MTS' credibility and to address any questions or issues it had with respect to the viability and likelihood of a sale of StarNet to MTS resulting in repayment of the indebtedness owed to OPIC. Indeed a meeting between OPIC, Mr. Gerwe, Mr. Kalenikhin and MTS was scheduled for September 14, 2012. However, OPIC filed this action against Mr. Gerwe on July 31, 2012 resulting in the cancellation of the meeting. The timing and disclosure of OPIC's lawsuit, filed prior to the scheduled meeting with MTS, destroyed the prospects of MTS' purchase of StarNet, and prevented repayment.[2] See Gerwe S.J. Decl., ¶¶ 35-37.

---

[2] OPIC's WAP confirms that OPIC knew that filing this action would be a deterrent to ongoing negotiations. The WAP also confirms OPIC's obligation to analyze the value of the project prior to considering litigation and to negotiate to an impasse before pursuing legal action. See Gerwe S.J. Decl., ¶¶ 35-37; see also WAP, p. 8, Sec. IV, ANALYSIS OF WORKOUT OPTIONS, Option 2. OPIC violated its own criteria when it instituted litigation prior to obtaining a valuation of the project while negotiations were pending and a meeting with MTS was scheduled to take place.

### III.   ARGUMENT

#### A. Standard Of Review

"'It is well settled that a court should grant a motion for summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact' " Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir.1990); see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).  The Supreme Court has noted that whether an issue is genuine and material for purposes of summary judgment it is decided under the directed verdict standard: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); see also Celotex. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Under Fed. R. Civ. P. 56, factual allegations of a nonmoving party that are supported by affidavits or other evidence should be regarded as true and should receive the benefit of the doubt when its assertions conflict with those of the movant. Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted. Taggart v. Time Inc., 924 F2d 43, 46 (2nd Cir. 1991); see also, Burtnieks v. City of New York, 716 F.2d 982, 983-4 (2d Cir. 1983).

In evaluating whether the movant has satisfied its burden, a court is not to weigh the evidence but instead is required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party and to eschew credibility assessments.   Amnesty Am. V. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004); Anderson, *supra*, 477 U.S. at 248. However, summary judgment is appropriate where there is no material evidence to

support the non-movant's position or where the undisputed facts establish that there are no genuine material issues of fact to warrant denial of summary judgment as sought by the movant.  Celotex Corp. v. Catrett, *supra*; Williams v. Brooklyn Union Gas Co., 819 F. Supp. 214, 224 (E.D.N.Y. 1993); Faufhnan v. Big Apple Car Serv., 828 F.Supp. 155, 160 (E.D.N.Y. 1993) ("Under the familiar standard of Rule 56, summary judgment is appropriate where there is no issue as to any material fact.  Put differently, the question to be resolved by the court is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

**B. OPIC Violated The Duty Of Good Faith And Fair Dealing**

OPIC is bound by the duty of good faith and fair dealing implied in every contract interpreted under New York law.  The obligation of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." See Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (1995).  Where such a contract contemplates the exercise of discretion, "this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  Id.  (emphasis supplied).

This Court has already held that OPIC's decision to approve, reject or ignore Mr. Gerwe's request to approve a sale of shares of Bressar from the minority shareholders to Mr. Gerwe is subject to the duty of good faith and fair dealing.  See, March 7, 2014 Transcript, pp. 26-27 (Rader S.J. Decl., Ex. F).  Accordingly, it is the law of the case that, as a matter of law, OPIC was obligated to act in good faith with respect to its exercise of discretion in determining whether or not to approve the shareholder restructure requested by Mr. Gerwe.  Id. *citing* Travelers International

AG v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994) ("[E]ven when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.); see also Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 231 (2d Cir. 1991); Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989).

"The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract...good faith performance emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."   Cross & Cross Properties, Ltd., supra, 866 F.2d at 502 (internal citations and quotations omitted).

In the instant case, both parties had a common purpose to retire StarNet's indebtedness to OPIC.  Accordingly, Mr. Gerwe had a justifiable expectation that OPIC would act in accordance with that common purpose by approving his request for consent to the shareholder restructure so that he could sell StarNet in order to achieve the common purpose – retirement of the StarNet debt.  At the very least, Mr. Gerwe had a right to expect that OPIC would not reject his request in an arbitrary and capricious matter.  See Dalton v. Educational Testing Serv ., supra, 87 N.Y.2d at 389. (Duty of good faith includes a promise not to act arbitrarily or irrationally).  However, as set forth above in the Statement of Facts, it is undisputed that OPIC: i) refused unreasonably to consent to the shareholder restructure, despite being informed that the shareholder restructure would lead to a sale of StarNet and repayment of the outstanding loan; ii) refused to consider Mr. Gerwe's valuation of StarNet; iii) did not get its own valuation;  iv) concealed its decision to institute litigation against Mr. Gerwe; v) disregarded the minimal cost of the proposed shareholder restructure and

the undisputed fact that it would not have impaired OPIC's collateral – the shares of StarNet; vi) did not comply with the standards set forth in its own Workout Action Plan, which required OPIC to "negotiate to an impasse" before filing legal action against Mr. Gerwe; vii) elected to file this action against Mr. Gerwe while a meeting with OPIC, Mr. Gerwe and MTS was scheduled.  OPIC did this despite the fact that its own Workout Action Plan reveals that OPIC knew that filing the lawsuit was likely to discourage the sale of StarNet to MTS and could interfere with the scheduled meeting.

**OPIC'S ACTUAL MALICE**

Based on these undisputed facts, Mr. Gerwe is clearly entitled to summary judgment dismissing OPIC's complaint and discharging the guaranty.   There is evidence that OPIC was motivated by actual bad-faith and malice.  OPIC's portfolio manager, Deborah Moronese, joined the OPIC "project team" on or about the end of 2011/ the beginning of 2012.  She took an immediate, and irrational, dislike to Mr. Gerwe.  Her very first telephone call with Mr. Gerwe was in March 2012, when she concluded that he was a "spoiled child."  In April 2012, less than a month later, OPIC, led by Ms. Moronese, secretly decided to take legal action against Mr. Gerwe,  while he was actively engaged in negotiating for the sale of StarNet -- and OPIC knew it. There was no basis for Ms. Moronese's animus toward Mr. Gerwe.  In fact, Mr. Gerwe was acting in a commercially reasonable manner, despite OPIC's intransigence.

OPIC's aggressive, unreasonable conduct towards Mr. Gerwe began when Ms. Moronese had decided that she did not like Mr. Gerwe.  As this Court noted in its initial decision denying OPIC's motion for summary judgment, OPIC's duty of good faith encompasses an obligation not to exercise its discretion in a manner which

amounts to an arbitrary or irrational exercise of such discretion. See, March 7, 2014 Transcript, p. 27, *citing* Dalton v. Educational Testing Services, 87 N.Y.2d at 389 (Rader S.J. Decl., Ex. F).   OPIC's conduct in this matter was commercially unreasonable, arbitrary and irrational. OPIC prevented Mr. Gerwe from arranging for the retirement of StarNet's indebtedness to OPIC.   It is undisputed that OPIC absented itself from the process.   Accordingly, Mr. Gerwe is entitled to summary judgment.

The implied duty of good faith and fair dealing prohibits any party to a contract from depriving another party of the benefits of the agreement. See, Filner v. Shapiro, 633 F.2d 139, 143 (2d Circ. 1980); Banque Nationale De Paris S.A.-Dublin Branch v. Ins. Co. of N. America, 896 F.Supp. 163, 164-5 (S.D.N.Y. 1995).  To meet the duty of good faith and fair dealing, a party must act with a "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Banque Nationale De Paris S.A.-Dublin Branch, supra, quoting Restatement (Second) Contracts § 205, Comment A (1981). An action is presumed contrary to a party's justified expectations when the obligation that the action violates is "essential to effectuate the contract's purposes." See, Havel v. Kelsey-Hayes Co., 83 A.D.2d 380, 384, 445 N.Y.S.2d 333 (4th Dept. 1981), *quoted in* Bank of China v. Chan, 937 F.2d 780, 789 (2d Circ. 1991) (holding that questions of fact regarding lender's breach of good faith, causing bankruptcy of borrower, prevented summary judgment against guarantor).

As applied to the guarantor of a loan, the good faith obligation requires the party who holds a guarantee not to deliberately impair or destroy the ability of the primary debtor to pay the primary debt. See, Bank of China, supra, 937 F.2d at 788-89; Sterling Nat'l Bank v. Longa, No. 99 CIV. 8978 (TPG), 2000 WL 1341449

(S.D.N.Y. 2000) (holding summary judgment against guarantors inappropriate where questions of fact existed regarding defense that lender acted in bad faith to undermine business of borrower). If the promisee unjustly causes the happening of a condition precedent to the guarantor's duty, the promisee discharges the guarantor from his contractual duty. See, Vanadium Corp. of Am. v. Fidelity & Deposit Co. of Maryland, 159 F.2d 105, 108 (2d Circ. 1947) (holding in action to recover on surety bond that plaintiff's failure to take action necessary for principal to perform precluded judgment against surety); Canterbury Realty & Equip. Corp. v. Poughkeepsie Savings Bank, 135 A.D.2d 102, 107, 524 N.Y.S.2d 531, 535 (3d Dept. 1988) (denying summary judgment against guarantors despite unconditional guaranty waiving defenses where issue of fact existed as to whether lender caused borrower's default).

It is undisputed from the facts above that OPIC violated its duty of good faith and fair dealing by actively thwarting Mr. Gerwe's efforts to satisfy his obligations, as well as StarNet's obligations. OPIC's institution of litigation against Mr. Gerwe, during ongoing negotiations and prior to the scheduled meeting among OPIC, Gerwe, other shareholders of StarNet and MTS, was irrational. It was likely to terminate negotiations for the sale of StarNet to MTS -- and it did. The arbitrary and irrational thing about this conduct is that not only did it injure Mr. Gerwe, it was contrary to OPIC's own self-interests as well. In a sense, by pre-empting repayment of the StarNet loan, OPIC kept itself from being repaid. This irrational and arbitrary conduct is a clear violation of the duty of good faith and fair dealing which entitles Mr. Gerwe to summary judgment. See, e.g., Dalton v. Educational Testing Services, supra, Canterbury Realty & Equip. Corp. v. Poughkeepsie Savings Bank, supra, National Westminster Bank USA v. Ross, 676 F. Supp. 48 (S.D.N.Y. 1987).

**C.** **Waivers Contained In The Guaranty Do Not License OPIC To Prevent**
**Repayment Of The Loan – Mr. Gerwe Is Entitled To Summary Judgment**

New York courts have ruled that a guarantor is entitled to a "good faith and

fair dealing" defense, notwithstanding express waiver of all defenses, where those

seeking to enforce the guaranty either caused the underlying default or where, post-

default, they prevented the primary obligor from covering the loss or engaged in other

inequitable conduct.  See National Westminster Bank USA v. Ross, supra, (even

though the "Guarantor waive[d] the right to interpose counterclaims or setoffs of any

kind and description in any litigation arising thereunder," lender breached the implied

obligation of good faith and fair dealing when it exercised its discretion to alter the

terms of the borrower's loan agreement by reducing -- without providing adequate

notice to find an alternate lender -- the amount of cash available under its factoring

arrangement, which led the borrower to default on a tax payment, resulting in a tax

lien, which in turn triggered an event of default under the loan agreement);  Bank of

New York v. Spring Glen Associates, 222 A.D.2d 992 (3rd Dep't 1995) (guarantor

who gave "unconditional guarantee of payment," permitted to raise a "good faith and

fair dealing" defense where it was alleged that the original guarantor had died, that

decedent's estate was denied a reasonable time to identify an acceptable substitute

guarantor,  guarantor had offered in the interim to continue making required

payments, which were refused, where guarantor was told to default on purpose to

facilitate negotiation of a workout, and action was brought  five months after

decedent's death while the parties were "engaged in negotiations over finding a

substitute guarantor or restructuring the loan"); River Bank America v. Daniel

Equities Corp., 213 A.D.2d 929, 931 (3rd Dep't 1995) (guarantor who gave "absolute"

guaranty could raise defense based on the implied covenant of good faith and fair

dealing where bank which had paid the required monthly interest to itself out of an

interest reserve account, unilaterally stopped this practice and, even though funds were available in the account to cover the payment, declared the mortgagor in default for failure to make the payments); Nassau Trust co. v. Montrose Concrete Products Corp., 56 N.Y.2d 175, 186 (1982) (guarantor that waived defenses based on oral modifications allowed to raise breach of obligation of good faith and fair dealing where there was a history of post-default extensions and where the guarantor had continued to negotiate "rather than to seek other ways out of its dilemma only to have [the lender] withdraw from those negotiations when foreclosure was instituted without notice or any reasonable opportunity to cure its defaults or conclude a negotiated sale of the mortgaged premises").

Other New York cases speak more broadly of guarantor defenses based on commercial unreasonableness or other inequitable conduct. See Bank of China v. Chan, 937 F.2d 780 (2d Cir. 1990) (even though guarantor had "unconditionally" guaranteed to bank the prompt payment when due of all obligations whether "direct, indirect, absolute, contingent or otherwise," and agreed to pay "unconditionally and absolutely forthwith upon demand," guarantor could raise defenses based on whether bank treated collateral securing debt in a commercially reasonable manner where bank's failure to drawn down letters of credit and thereby reduce the indebtedness appeared to violate the implied covenant of good faith and fair dealing which, if prove "would be a complete defense to the guaranty"); FDIC v. Wrapwell Corp., 922 F. Supp. 913 (S.D.N.Y. 1996) (guarantor that waived all defenses, including recourse to pledged collateral, cannot be deemed to have waive defense of commercial unreasonableness under NY UCC 9-504 [now N.Y. UCC 9-610(b)] and may therefore raise defense at least as to amount of damages owed that lender failed to act reasonably in disposing of pledged collateral); Sterling National Bank v. Longa, 2000

WL 1341449 (Sept. 15, 2000 S.D.N.Y.) at *2) (guarantor that waived all defenses did not waive defense that lender "acted in bad faith to undermine and ultimately destroy" business of primary debtor, citing Chan, "which held that a party who holds a guarantee makes an implied promise not to deliberately impair or destroy the ability of the primary debtor to pay the primary debt"); see also Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank, 135 A.D.2d 102, 107-108 (3rd Dep't 1988) (notwithstanding instruments in which guarantors "irrevocably and unconditionally guaranteed payment when due, whether by acceleration or otherwise and that "no invalidity, irregularity, or unenforceability of all or any part of the liabilities hereby guaranteed shall affect, impair or be a defense to this guaranty," guarantor was nevertheless permitted to raise defenses where lender, which had allowed borrower to exceed its credit line while application for higher credit limit was pending, declared borrower in default, accelerated the debt, and demanded guarantors pay debt in full, where "post execution conduct of the parties affected the existence of a necessary condition precedent to acceleration of liability under the express terms of the guarantee"); Manufacturers & Traders Trust Co. v. Sullivan, 188 A.D.2d 1023 (4th Dep't 1992) (even though guaranty expressly provides that guarantor's obligations are independent of any duty lender may have to protect or preserve collateral, summary judgment not warranted where factual issues exist whether lender "interfered with or prevented the occurrence of conditions which would have terminated defendants' liabilities under the guaranties and whether, as a result, defendants are relieved of their obligations under those guaranties"); Barclays Bank of New York, N.A. v. Heady Electric Co., 174 A.D.2d 963, 966 (3rd Dep't 1991) (despite broad waiver of defenses, guarantor could raise as a defense lender's failure to use reasonable care in the custody and preservation of collateral); N.Y. UCC 9-610(b) (replaces UCC 9-504,

states ""[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable, a secured party may dispose of collateral by public or private proceedings. . . .").

As a result of OPIC's failure to consent to the buyout of the minority shareholders, Mr. Gerwe's right to arrange a private sale of the StarNet stock and thereby effectuate a payoff of the indebtedness of the primary obligor was frustrated in its entirety.   The fact that Mr. Gerwe had waived all defenses, including any defenses based on any failure by OPIC to resort to the collateral securing the loan is of no consequence where, as here, Mr. Gerwe was also in the position, as majority-owner of Bressar, which owned StarNet, to effectuate a sale of StarNet and use its proceeds to pay off the entire OPIC indebtedness, but was prevented from doing so by OPIC's obstruction of the financial restructure which enabled repayment.

That makes this case very similar to Chan where, even though the guarantor waived all defenses, the bank's failure to use the collateral that had been pledged as security for the loan to reduce the amount owed appeared to violate the implied covenant of good faith and fair dealing and "would get a complete defense to the guaranty." It is also similar to Wrapwell, where, at a minimum, a guarantor that had waived all defenses could still raise a defense as to damages where the lender failed to act reasonably to dispose of the pledged collateral. And it is also similar to Longa, where a guarantor who waived all defenses did not waive defenses that deliberately impaired or destroyed "the ability of the primary debtor to pay the primary debt."

Wholly apart from the implied obligation of good faith and fair dealing,  the implied obligation under Article 9 of the UCC – and specifically Article 9-610(b) – which requires that every aspect of a disposition of collateral securing a debt must be disposed of in a "commercially reasonable manner." It is undisputed that the stock of

Bressar was pledged to OPIC as collateral to secure the repayment of the StarNet loan. OPIC did <u>not</u> dispose of the shares in a commercially reasonable manner to at least reduce StarNet's indebtedness, if not extinguish it entirely. Egregiously, OPIC, in refusing to consent to Gerwe's request for consent to buy out the minority shareholders, prevented a private sale of the stock which would have accomplished the same thing. This case is therefore similar to <u>Sullivan</u>, where even though guarantor had waived all relevant defenses, the lender "interfered with or prevented the occurrence of conditions which would have terminated defendants' liabilities under the guaranties"). It is also similar to <u>Barclay's</u>, where despite a broad waiver of defenses, the guarantor was allowed to raise the lender's failure to use reasonable care in the custody and preservation of collateral.

OPIC's unreasonable and irrational decision to refuse consent to buy out the minority, at the same time as Mr. Gerwe was trying to arrange a sale of StarNet and a meeting in Russia between the prospective purchaser and OPIC to get the primary indebtedness paid in full, further demonstrates that OPIC consciously breached the implied covenant of good faith and fair dealing. This case is very similar to <u>Bank of N.Y. v. Spring Glen Assoc.</u>, [<u>supra</u>, 222 A.D.2d at 922], where despite a broad waiver of defenses, the guarantor was permitted to argue that the lender breached the implied obligation of good faith and fair dealing when it commenced litigation five months after the default while the guarantor estate was in negotiations to arrange for a substitute guarantor. It is also similar to the Court of Appeals' holding in <u>Montrose</u>, where a guarantor that had waived all relevant defenses had continued to negotiate "rather than to seek other ways out of its dilemma only to have [the lender] withdraw from those negotiations when foreclosure was instituted without notice or any reasonable opportunity to cure its defaults or conclude a negotiated sale of the

mortgaged premises"). Nassau Trust co. v. Montrose Concrete Products Corp., supra, 56 N.Y.2d at 186.

Mr. Gerwe is entitled to raise the defense of good faith and fair dealing, and he is entitled to prevail on that defense on the undisputed of this case. OPIC prevented Mr. Gerwe from satisfying his guaranty and blocked repayment of the OPIC loan. OPIC has violated its duty of good faith and fair dealing and summary judgment should be granted in Mr. Gerwe's favor. The following New York Court of Appeals cases all support summary judgment in favor of Mr. Gerwe:

(a) Dalton v. Educational Testing Service, 87 N.Y.2d 384, 389 (1995) holds that an implied contractual obligation of good faith and fair dealing inheres in every contract, and "includes a promise not to act arbitrarily or irrationally in exercising [contractual] discretion.";

(b) 511 West 232nd Owners Corp. v. Jennifer realty Co., 98 N.Y.2d 144, 153 (2002) (the implied contractual obligation of good faith and fair dealing "encompasses any promises which a reasonable person in the position of the promise [here a guarantor seeking to permission to sell collateral so that he can repay his obligation and as well as the additional amounts of indebtedness owed by the borrower]";

(c) Wieder v. Skala, 80 N.Y.2d 628, 637 (1992) ("The idea is simply that when A and B agree that B will do something [repay loan] it is understood that A will not prevent B from doing it. The concept is rooted in notions of common sense and fairness.");

(d) Goodstein Construction v. City of New York, 67 N.Y.2d 990, 991-92 (1986) (a contracting party does not assume the risk that the other party will act in bad faith);

    (e) <u>Ashland Mgmt. Inc. v. Janien</u>, 82 N.Y.2d 395, 402 (1993) (defining good faith pursuant to § 205 of the Restatement (2d) of Contracts).[3]

In addition, the Second Circuit has also held repeatedly that a bank must comply with an implied contractual obligation of good faith and fair dealing:

    (a) <u>Bank of China v. Chan</u>, 937 F.2d 780, 788-89 (2d Cir. 1991) (Second Circuit held that the Bank did have an implied duty of good faith and fair dealing to its debtor);

    (b) <u>Indu Craft Inc. v. Bank of Baroda</u>, 87 F.3d 614, 616 (2d Cir. 1996) (Second Circuit upheld a jury verdict against a bank for "breach of its covenant of good faith and fair dealing implied in a loan agreement between the parties' because the jury found that the bank's actions "wrongfully prevented [the debtor] from repaying the note.";

    (c) <u>Cross & Cross Properties, Ltd. v. Everett Allied Company</u>, 886 F.2d 497, 502 (2d. Cir. 1989) (Second Circuit stated that "contracting parties' fields of discretion under a contract are bounded by the parties' mutual obligation to act in good faith."

---

[3] Restatement (2d) of Contracts § 205 ("Bad faith" includes conduct "that violate[s] community standards of decency, fairness or reasonableness" such as "evasion of the spirit of the bargain", "abuse of a power to specify terms," and "interference or failure to cooperate in the other party's performance.")

IV.    **CONCLUSION**

MR. GERWE SHOULD NOT BE PENALIZED FOR OPIC'S
MISCONDUCT.

For the reasons set forth above, Defendant's motion for summary judgment

should be granted and Plaintiff's complaint should be dismissed, with prejudice.

Dated: New York, New York
        April 15, 2015                                    Respectfully submitted,

                                                          EATON & VAN WINKLE LLP

                                                  By:_____/s/_____
                                                          Michael A. Lacher. (ML 8229)
                                                          Adam Rader (AR 3530)
                                                          *Attorneys for Defendant*
                                                          *Peter Eugene Gerwe*
                                                          3 Park Avenue, 16th Floor
                                                          New York, New York 10016
                                                          (212) 779-9110