UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 03/28/2016

---

OVERSEAS PRIVATE INVESTMENT
CORP.,

               Plaintiff,

      v.

PETER EUGENE GERWE,

             Defendant.

No. 12-CV-5833 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Overseas Private Investment Corp. ("OPIC") brings this action against Defendant Peter Eugene Gerwe for breach of a loan guaranty obligation. On March 7, 2014, the Court denied as premature OPIC's motion for summary judgment and granted in part Gerwe's cross-motion to continue so that Gerwe could obtain discovery related to his affirmative defense that OPIC breached the implied covenant of good faith and fair dealing. *See* Dkt. 47 & 48. Now before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, OPIC's motion is granted and Gerwe's is denied.

## BACKGROUND

### I.    Factual Background[1]

#### A.    The Parties and Their Relevant Agreements

OPIC is a United States government agency that, in part, makes loans to fund projects sponsored by United States citizens. Def.'s 56.1 ¶ 1; Smith S.J. Decl. ¶ 2. On September 2, 2009,

---

[1] The facts set forth herein are taken from the parties' Local Civil Rule 56.1 statements and accompanying declarations and exhibits. Because some declarants submitted multiple declarations in the course of briefing the parties' cross-motions, the Court will refer to them as follows to avoid confusion: declarations submitted with the parties' moving papers will be referred to as "S.J. Decl.," declarations submitted with the parties' opposition papers

OPIC entered into a Loan Agreement with "Closed Joint Stock Company 'Star Networks'" in which OPIC agreed to lend Star Networks up to $28 million. Def.'s 56.1 ¶¶ 2–3; Smith S.J. Decl. ¶ 4; Gerwe S.J. Decl. ¶ 2; Loan Agreement § 2.01(a).[2]  Star Networks is a Russian internet service provider located in Moscow. Gerwe S.J. Decl. ¶ 2. All of Star Networks' capital shares are owned by a parent company called Bressar Holdings Limited. *See* Def.'s 56.1 ¶ 9. A majority—but not all—of Bressar's capital shares are owned by a holding company called PRT Holdings Limited Co., which is in turn owned completely by Gerwe. *See* Smith S.J. Decl. Ex. 3 at 2; Rader S.J. Decl. Ex. D at 2.

On October 1, 2009, OPIC, Star Networks, Bressar, and Gerwe entered into a Project Completion Agreement (the "PCA"), in which Gerwe personally guaranteed up to $5 million of Star Networks' debt under the Loan Agreement. Def.'s 56.1 ¶¶ 7–8; Smith S.J. Decl. ¶ 6; Gerwe S.J. Decl. ¶ 3; PCA § 3(a).[3]

On October 5, 2009, OPIC, PRT Holdings, and the other holding companies owning the remainder of Bressar's capital shares entered into a Sponsors Stock Pledge and Share Retention Agreement (the "SPA"), in which PRT Holdings and the other holding companies pledged their capital shares in Bressar as collateral for Star Networks' debt and Gerwe's guaranty. Gerwe S.J. Decl. ¶ 4; SPA § 2(a).[4]  In the event that Star Networks were to default on the Loan Agreement, the SPA authorizes OPIC to sell Bressar's capital shares and apply the proceeds to Star Networks' debt obligations. Def.'s 56.1 ¶ 12; SPA § 6(c). The SPA also provides that "unless otherwise expressly allowed in writing by [OPIC], the [holding companies] will not sell, assign, transfer,

---

will be referred to as "Opp. Decl.," and declarations submitted with the parties' reply papers will be referred to as "Rep. Decl."

[2] The Loan Agreement is attached as Exhibit 1 to the Smith S.J. Decl. and as Exhibit A to the Rader S.J. Decl.

[3] The PCA is attached as Exhibit 3 to the Smith S.J. Decl. and as Exhibit D to the Rader S.J. Decl.

[4] The SPA is attached as Exhibit E to the Rader S.J. Decl.

pledge or encumber in any other manner all or any of the [Bressar shares] or suffer to exist any encumbrance on the [Bressar shares]." SPA § 5(b).

Also on October 5, 2009, Star Networks executives executed a Debt Instrument and received $9 million under the Loan Agreement. Def.'s 56.1 ¶ 5; Smith S.J. Decl. ¶ 5; Debt Instrument at 1.[5] The Loan Agreement, PCA, and Debt Instrument all contain choice of law provisions stating that they are to be governed by New York law. *See* Loan Agreement § 9.03; PCA § 19; Debt Instrument at 2. The SPA contains a choice of law provision stating that it is to be governed by the laws of the Republic of Cyprus. SPA § 16.1.

### B.    Star Networks' Struggles

Star Networks struggled almost immediately after receiving the loan proceeds from OPIC. In an email sent to OPIC officials on December 22, 2011, Gerwe summarized the market challenges Star Networks faced shortly after receiving the loan proceeds:

> We had thought at the time that the worst financial crisis in recent history was just starting to work itself out and that Russia, with its natural resources, was recovering and moving back to normal. . . . What we had not anticipated (and certainly should of [*sic*]) is that the equity and investment market in Moscow did not recover . . . .

Rader S.J. Decl. Ex. J.

Beginning in the summer of 2010, Gerwe and others at Star Networks spearheaded a series of plans to reorganize or sell Star Networks in order to pay off the company's loan obligation to OPIC. *See* Def.'s Resp. to Pl.'s 56.1 ¶ 4.[6] First, in July 2010, officials at Star Networks negotiated a potential merger with a company called WestCall, another Russian telecommunications firm. *See* Smith S.J. Decl. ¶¶ 18–19 & Ex. 5. On August 10, 2010, an OPIC official emailed a Star

---

[5] The Debt Instrument is attached as Exhibit 2 to the Smith S.J. Decl. and as Exhibit B to the Rader S.J. Decl.
[6] Although Gerwe "disputes the materiality" of most of the plans to reorganize or sell Star Networks, he does not dispute that the plans existed. Def.'s Resp. to Pl.'s 56.1 ¶ 4.

Networks official asking for "additional information" on the deal, including a "merger model" and a "[memorandum of understanding] and any other agreements or understandings" between Star Networks and WestCall. Smith S.J. Decl. Ex. 5. On August 11, 2010, Star Networks provided OPIC with a copy of the memorandum of understanding. *See id.* On October 20, 2010, however, a Star Networks official notified OPIC that "the merger discussion with WestCall [was] off." Smith S.J. Decl. Ex. 6.

Second, on December 21, 2010, Gerwe emailed OPIC that he was "close to an agreement" with a company called Net By Net to "acquire Bressar / Star[ Networks] for the value of the OPIC loan plus any accrued interest." Smith S.J. Decl. Ex. 7. OPIC claims that "[b]etween January 2011 and March 2011, [it] made repeated requests for information and documentation regarding the proposed transaction until it became apparent that this deal had also fallen through." Smith S.J. Decl. ¶ 22.

Third, on June 1, 2011, a Star Networks official emailed OPIC an outline of an "agreed . . . deal structure" with a company called Lealta. Smith S.J. Decl. Ex. 8. OPIC claims that between June 2011 and December 2011, it "again spent substantial time reviewing the proposed deal and requesting [that Star Networks] provide information required for it to perform due diligence." Smith S.J. Decl. ¶ 24.

On December 15, 2011, Star Networks failed to make a principal payment to OPIC. Smith S.J. Decl. ¶ 8. One week later, on December 22, 2011, Gerwe emailed OPIC officials to inform them that "[t]he most recent scenario (the Lealta deal) now looks like it will not close." Smith S.J. Decl. Ex. 9; Rader S.J. Decl. Ex. J. Gerwe said that his "best plan [was] to sell [Star Networks] in 2012 or 2013 and repay the OPIC loan in its entirety." *Id.* Gerwe also informed OPIC that he "accepted a CEO post in Moscow for Sistema Mass Media" and that he "live[d] in Moscow during

4

the week and plan[ned] to oversee rebuilding [Star Networks] operations from the first of January 2012." *Id.*

## C.    Star Networks' Default

On March 2, 2012, OPIC sent Star Networks, Bressar, and Gerwe a notice of default claiming, in part, that Star Networks "failed to pay [the] principal installment due December 15, 2011." Smith S.J. Decl. Ex. 4 at 2. The notice also claimed that Gerwe "failed to provide quarterly bank/brokerage statements as of March 31 and September 30 of each calendar year that reflect his holding of liquid and unencumbered assets of at least $5,000,000 in market value," all as required by the PCA. *Id.* at 3.

According to OPIC, during a conference call with OPIC officials on March 21, 2012, Gerwe acknowledged the default and his liability under the guaranty, but requested a year-long forbearance to give him more time to sell Star Networks and use the proceeds to pay the company's liability under the Loan Agreement. *See* Moronese Opp. Decl. ¶¶ 8–9 & Ex. A. OPIC further contends that it did not agree, but nonetheless asked Gerwe to submit a written proposal describing his plan to sell Star Networks and cure the Loan Agreement defaults, which Gerwe never submitted. *See* Moronese Opp. Decl. ¶¶ 15–16 & Ex. A. Deborah Moronese, one of the OPIC officials on the call, testified in her deposition that Gerwe "was frustrated on the phone and became angry" and "acted like a spoiled child." Rader S.J. Decl. Ex. N at 38.[7]

Gerwe continued his attempts to sell Star Networks. In April 2012, he notified OPIC that he was negotiating a sale of Star Networks to MTS, another Russian telecommunications company. *See* Smith S.J. Decl. ¶ 26; Gerwe S.J. Decl. ¶ 23–24. The parties disputed the potential value of

---

[7] Ms. Moronese joined the OPIC project team working on the Star Networks account in December 2011. *See* Moronese Opp. Decl. ¶ 5. The phone call on March 21, 2012 was her first phone call with Gerwe and one of her first interactions with him. *See id.* ¶ 8; Rader S.J. Decl. Ex. N at 38.

Star Networks. According to OPIC, Defendant told OPIC officials during a telephone call on April 25, 2012 that MTS was considering a price between $5 million and $9 million and that the sale would be completed within 90 days. *See* Moronese Opp. Decl. ¶ 11 & Ex. B. According to Gerwe, Star Networks was worth $9 million to $12.8 million. *See* Gerwe S.J. Decl. ¶ 24; Rader S.J. Decl. Ex. M.[8]

At some point after the phone call with Gerwe on April 25, 2012, officials at OPIC "decided to pursue litigation against [Gerwe]." Pl.'s Resp. to Def.'s 56.1 ¶ 27. OPIC claims that despite making "numerous requests for details of the proposed sale" to MTS, "[n]o evidence of actual intent to purchase by MTS [was] ever [] provided to OPIC." Smith S.J. Decl. ¶ 27. Nonetheless, on June 3, 2012, in response to questions posed by Ms. Moronese, Gerwe reiterated in an email that he expected to sell Star Networks to MTS "by the end of July" and that he continued to believe a one-year forbearance on Star Networks' debt to OPIC was "a very reasonable request." Smith S.J. Decl. Ex. 10.

### D.    OPIC's Path to Litigation

On June 8, 2012, OPIC officials—including Ms. Moronese—finalized a Workout Action Plan ("WAP") that analyzed whether OPIC should sue Gerwe or continue to negotiate with him. *See* Smith S.J. Decl. ¶ 31; WAP at 5–8.[9] The WAP considered two options. Under "Option 1," OPIC would "[c]ommence legal action against [Gerwe] for default under [Gerwe's] PCA guaranty obligations." WAP at 5. Under "Option 2," OPIC would "[c]ontinue to negotiate with [Gerwe, Star Networks, and Bressar]." *Id.* at 7. In describing Option 2, the WAP noted that Gerwe "did

---

[8] Gerwe obtained a one-page valuation of Star Networks dated April 30, 2012 that estimates the company to be worth $9 million to $12.8 million. Rader S.J. Decl. Ex. M. The valuation was prepared by a financial analyst who worked for Sistema Mass Media, the company for which Gerwe was CEO. *See* Gerwe S.J. Decl. ¶ 25. OPIC has questioned the analysis in the valuation. *See* Smith Opp. Decl. ¶¶ 19–20.

[9] The WAP is attached as Exhibit 11 to the Smith S.J. Decl. and as Exhibit K to the Rader S.J. Decl.

not provide any details or confirmation of any negotiations with any potential buyers." *Id.* Ultimately, the WAP recommended Option 1 in light of "[Star Networks'] inability to service the OPIC loan and [Gerwe's] unwillingness to pay the accelerated OPIC loan amount pursuant to the Default Notice." *Id.* at 8. The WAP also recommended "that, even while proceeding with Option 1, OPIC [should] continue to entertain any constructive proposals of [Star Networks, Bressar] and/or [Gerwe] that offer . . . a higher recovery amount than the aggregate amount of potential recoveries available through continued litigation." *Id.* Finally, the WAP suggested that "[w]hile pursuing litigation, OPIC will engage an outside consultant to provide a valuation of [Star Networks]." *Id.* at 1. OPIC approved the WAP on or about June 12, 2012. *See* Smith S.J. Decl. ¶ 33.

On June 13, 2012, Gerwe notified OPIC in an email that Bressar's minority shareholders threatened Star Networks' ability to pay its loan obligations and Gerwe's ability to sell Star Networks to MTS. Rader S.J. Decl. Ex. G. Specifically, Gerwe said the minority shareholders were "blocking all capital calls," which prevented him from investing his own money in Star Networks to repay its debt to OPIC. *Id.* The minority shareholders also wanted "to be bought out" before the company was sold. *Id.*[10] Gerwe said he "agreed with all shareholders to buy everyone out and . . . take over 100% ownership" of Bressar. *Id.* Gerwe acknowledged that he "need[ed] OPIC approval" to buy out Star Networks' minority shareholders. *Id.*

On June 14, 2012, Ms. Moronese responded to Gerwe's email and noted that "OPIC has not approved [his] request." *Id.* On June 15, 2012, Ms. Moronese followed up and said that "OPIC

---

[10] Gerwe also claims that MTS wanted him to buy out Bressar's minority shareholders because "[t]he decision makers at MTS knew [Gerwe], trusted [him] and wanted to complete the transaction with [him]." Gerwe S.J. Decl. ¶ 15. According to Gerwe, MTS was "insistent that [he] purchase the minority shareholders' interests prior to any sale" of Star Networks in order to "reliev[e] MTS of necessary costs and time commitment to due diligence on the minority shareholders" as required by the Foreign Corrupt Practices Act. *Id.*

does not approve that you or anyone else buy out shareholders or minority shareholder[s] prior to making payment and paying off the OPIC debt." *Id.* Ms. Moronese made clear to Gerwe OPIC's position that "minority shareholders d[id] not have priority or seniority to OPIC debt." *Id.*

In early July 2012, Gerwe exchanged additional emails with OPIC officials regarding his desire to buy out Bressar's minority shareholders in order to facilitate MTS' purchase of Star Networks. *See* Rader S.J. Decl. Ex. H. On July 6, 2012, Gerwe wrote to "request[] that OPIC allow [him] to take over 100% ownership of [Star Networks]." *Id.* Gerwe provided two reasons for his request: (1) "[t]o close the MTS deal"; and (2) to ensure that Bressar's minority shareholders could not prevent Star Networks from reimbursing Gerwe should he fulfill his $5 million guaranty to OPIC before the MTS sale closed. *Id.* According to Gerwe, it would have cost approximately $300,000 to buy out all of Bressar's minority shareholders. Gerwe S.J. Decl. ¶ 17.

Later on July 6, 2012, an OPIC official responded and told Gerwe to "determine a way forward for you to satisfy your guaranty obligation to OPIC before buying out your fellow upstream shareholders." Rader S.J. Decl. Ex. H. The email also indicated that "OPIC is willing to work with you were you to request OPIC's approval for a change of ownership but only after you had honored that obligation." *Id.* Only July 8, 2012, Gerwe responded that OPIC's position "put[ him] into a very difficult situation where [he could not] close the primary (and very profitable) sale option we have; nor, cleanly put the $5.0 mil into the company to pay OPIC." *Id.* Later on July 8, 2012, the OPIC official indicated that OPIC would not change its position and that OPIC had "seen no proposal from [Gerwe] to buy out [his] fellow shareholders or to buy out the OPIC loan that would provide for OPIC to be paid out first." *Id.*

On July 31, 2012, OPIC initiated this lawsuit. *See* Dkt. 1. The next day—before Gerwe was served—Ms. Moronese requested a meeting with Gerwe in Moscow on September 14, 2012

to discuss Star Networks' financial condition and the status of Gerwe's attempt to sell the company to MTS. *See* Rader S.J. Decl. Ex. I. Gerwe was served on August 14, 2012, *see* Dkt. 3, and on August 16, 2012, Ms. Moronese emailed Gerwe to confirm the details of their upcoming meeting, *see* Rader S.J. Decl. Ex. I. According to OPIC, Gerwe cancelled the meeting in early September on the advice of counsel "due to the pending litigation." Smith S.J. Decl. ¶ 37. According to Gerwe, this action caused MTS to "walk[] away" from its plans to purchase Star Networks. Gerwe Rep. Decl. ¶ 23.

## II.     Procedural History

After OPIC initially moved for summary judgment, Gerwe filed a cross-motion to continue pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. On March 7, 2014, the Court denied OPIC's motion as premature and granted in part Gerwe's cross-motion. *See* Dkt. 47. Specifically, the Court granted Gerwe's cross-motion only as to his "breach of good faith defense." *Id.*

The parties engaged in discovery regarding Gerwe's claim that OPIC breached the implied covenant of good faith and fair dealing, and OPIC again moved for summary judgment. *See* Dkt. 85. Gerwe cross-moved for summary judgment on the basis of his implied covenant defense. *See* Dkt. 89. The Court now grants OPIC's motion and denies that of Gerwe.

## LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When parties cross-move for summary judgment, "each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *Smith v. BarnesandNoble.com, LLC*, ___ F. Supp. 3d ___, 2015 WL 6681145, at *3 (S.D.N.Y. Nov. 2, 2015) (quoting *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99-CV-10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000)).

## DISCUSSION

To be entitled to relief, OPIC must establish beyond genuine dispute that Gerwe's debt guaranty obligation is valid and that Defendant's affirmative defense based on the implied covenant of good faith and fair dealing is without merit.  On the other hand, for the Court to dismiss OPIC's Complaint, Gerwe must establish beyond genuine dispute either that his debt guaranty obligation is invalid or that his implied covenant defense is meritorious.  For the reasons set forth below, OPIC has met its burden but Gerwe has not.

### I.   Validity of Gerwe's Debt Guaranty

The validity of Gerwe's guaranty is governed by New York law.[11]  "A plaintiff seeking to enforce a guarantee of payment under New York law must show that [1] a third party owes the plaintiff a debt, [2] the defendant guaranteed payment of that debt, and [3] the debt has not been paid by the third party or the defendant." *Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, 34 F. Supp. 3d 321, 326 (S.D.N.Y. 2014) (citing *Donjon Marine Co. v. Water Quality Ins. Syndicate*, 523 F. App'x 738, 741 (2d Cir. 2013)).  "An action to enforce a guarantee— typically based on unambiguous contract language—is particularly amenable to resolution on summary judgment." *Aersale Inc. v. Ibrahim*, No. 13-CV-713 (KBF), 2013 WL 5366384, at *4 (S.D.N.Y. Sept. 25, 2013) (citing *Citicorp Leasing, Inc. v. United Am. Funding, Inc.*, No. 03-CV-

---

[11] The PCA contains both Gerwe's guaranty and a New York choice of law clause. *See* PCA §§ 3(a), 19.

1586 (WHP), 2005 WL 1847300 (S.D.N.Y. Aug. 5, 2008); *Brookman & Brookman v. Schiavoni*, 665 N.Y.S.2d 419 (App. Div. 1997)).

OPIC has met its burden. The Loan Agreement and Debt Instrument establish that Star Networks owes OPIC a debt, and the PCA establishes that Gerwe guaranteed that debt up to $5 million. *See* Loan Agreement § 2.01(a); Debt Instrument at 1; PCA § 3(a); *see also* Pl.'s S.J. Mem. at 3. Gerwe does not dispute that on December 15, 2011, Star Networks failed to make a principal payment on its loan, or that that on March 2, 2012, OPIC issued a call letter declaring the loan to be in default. *See* Smith S.J. Decl. ¶¶ 8–9 & Ex. 4. Nor does Gerwe dispute that neither he nor Star Networks have paid the loan since then. OPIC has therefore established the validity of Gerwe's guaranty of up to $5 million of Star Networks' outstanding debt.

## II. Gerwe's Defenses

Gerwe raised eight affirmative defenses in his Answer, *see* Dkt. 10 ("Ans.") ¶¶ 21–28, but only one remains before the Court.[12] Gerwe did not raise five of these defenses—the first, second, third, fifth, and sixth—in any briefing or argument, and the Court therefore deems them abandoned. *See Faunus Grp. Int'l, Inc. v. Ramsoondar*, No. 13-CV-6927 (JSR), 2015 WL 4557132, at *3 n.1 (S.D.N.Y. July 22, 2015) (dismissing "boilerplate affirmative defenses" that were not "the subject of any briefing or argument"). In addition, the Court has already held that two of the three remaining defenses—the fourth and eighth—lack merit. *See* Dkt. 48 at 23–26 (rejecting fraudulent inducement defense), 29–30 (rejecting defense based OPIC's service of notice of default). The only issue remaining for the Court to decide, therefore, is the merits of

---

[12] The eight defenses are: (1) failure to state a claim; (2) improper service; (3) illegality of the Loan Agreement, Debt Instrument, and PCA; (4) fraud, concealment, and misrepresentation; (5) inadequate consideration with regard to the PCA; (6) lack of mutuality; (7) breach of the implied covenant of good faith and fair dealing; and (8) failure to provide proper notice of default. *See* Ans. ¶¶ 21–28. Gerwe also raised a ninth affirmative defense in which he "g[ave] notice that he intends to rely upon and assert all other affirmative defenses which become known or apparent during the course of discovery, and . . . reserve[d] the right to amend his Answer to assert any and all such defenses." *Id.* ¶ 29. Gerwe has not identified any additional defenses, nor has he sought to amend his Answer.

11

Gerwe's seventh affirmative defense, in which he alleges that "Plaintiff's claims are barred, in whole or in part, due to its breach of the implied covenant of good faith and fair dealing." Ans. ¶ 27.

As an initial matter, even though Gerwe's implied covenant claim arises under the SPA—which contains a Cyprus choice of law clause—the Court will apply New York law to determine the merits of Gerwe's defense. *See* SPA § 16.1. "In the Second Circuit, where parties fail to raise the issue of the applicability of a foreign law to a particular issue, a district court may choose to apply the law of the state in which it sits." *MSF Holding Ltd. v. Fiduciary Trust Co.*, 435 F. Supp. 2d 285, 301 (S.D.N.Y. 2006) (citing *Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n.4 (2d Cir. 1981)); *see also* Fed. R. Civ. P. 44.1 ("A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."). Neither party here alerted the Court to the existence of the SPA's choice of law clause. Even after the Court brought the choice of law clause to the attention of the parties, *see* Dkt. 114, both parties indicated that they had no objection to the application of New York law, *see* Oral Arg. Tr. 20. New York law therefore applies.

The crux of Gerwe's defense is that OPIC breached the implied covenant when it did not consent to Defendant's request to buy out Bressar's minority shareholders. *See* Def.'s S.J. Mem. at 11–13; SPA § 5(b). According to Gerwe, OPIC abused its discretion under the SPA by arbitrarily and irrationally thwarting his plan to retire Star Networks' debt and pursuing litigation against him instead. *See* Def.'s S.J. Mem. at 11–13. Gerwe argues that it was necessary for him to buy out Bressar's minority shareholders in order to sell Star Networks to MTS and use the sale proceeds to pay OPIC. *See id.* OPIC contends that it "acted in accord with standard commercial practices

in a rational and commercially reasonable manner." Pl.'s Opp. Mem. at 12.[13] As discussed below, Gerwe's implied covenant defense fails for two independent reasons.

### A.    Scope of the Implied Covenant of Good Faith and Fair Dealing

Under New York law, every contract contains an implied covenant of good faith and fair dealing that "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)). "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994). Exercising discretion in good faith amounts to "a promise not to act arbitrarily or irrationally." *Dalton*, 663 N.E.2d at 291–92.

The implied covenant, "however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Id.* at 292 (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). The Second Circuit has accordingly concluded that "[w]here a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004).

---

[13] In its opening brief in support of its motion for summary judgment, OPIC also argued that Gerwe's implied covenant claim fails because Gerwe waived his right to raise affirmative defenses in the PCA. *See* Pl.'s S.J. Mem. at 3–5. OPIC did not raise this point in opposition to Gerwe's motion for summary judgment or in its reply brief in support of its own motion. At oral argument, OPIC's counsel noted that OPIC was "honoring the Court's prior decision that [the implied covenant] defense remains viable to [Gerwe]." Oral Arg. Tr. 8.

The New York Court of Appeals has clarified—albeit in the context of analyzing a clause in a real estate contract that made a sale contingent upon attorney approval—that New York law "do[es] not ordinarily read implied limitations into unambiguously worded contractual provisions designed to protect contracting parties." *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008). In *Moran*, the Court of Appeals noted that the attorney approval clause at issue did not expressly limit the grounds on which approval could be withheld. *See id.* The court ultimately concluded that the goal of maintaining predictability in contract law counseled against "[r]eading a bad faith exception" into the attorney approval clause because it "would create . . . [a] regime where 'question[s] of fact precluding summary judgment' would 'usually [be] raise[d]' . . . *any time* an attorney disapproved a real estate contract pursuant to an attorney approval contingency." *Id.* at 191 (quoting *McKenna v. Case*, 507 N.Y.S.2d 777, 777 (App. Div. 1986)) (emphasis in original).

"[C]ourts in this district 'have interpreted *Moran* broadly.'" *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 472 (S.D.N.Y. 2013) (quoting *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 334–45 (S.D.N.Y. 2010)); *see World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, No. 03-CV-8843 (LAP), 2010 WL 3155176, at *13 (S.D.N.Y. July 30, 2010) ("While *Moran*'s holding was confined to attorney approval clauses in real estate contracts, other courts have extended *Moran*'s logic to other types of discretionary clauses."); *Paxi, LLC v. Shiseido Ams. Corp.*, 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009) ("Following [*Moran*'s] logic, the obligation of good faith and fair dealing does not negate a[n] expressly bargained-for clause that allows a party to exercise its discretion, unless that clause imposes a limit on the discretion to be exercised or explicitly states that the duty of good faith and fair dealing applies."). "The broad application of *Moran* suggests that a court may not limit contractual discretion where limitations

are not supported by the express contractual language." *In Touch Concepts*, 949 F. Supp. 2d at 472.

Applying *Moran* as other judges in this district have applied it, the Court can come to no conclusion other than that Gerwe's implied covenant defense fails. The SPA provides in relevant part only that "unless otherwise expressly allowed in writing by [OPIC], the [Bressar holding companies] will not sell, assign, transfer, pledge or encumber in any other manner all or any of the [Bressar shares] or suffer to exist any encumbrance on the [Bressar shares]." SPA § 5(b). This language does not limit OPIC's discretion, and OPIC's exercise of that discretion accordingly did not violate the implied covenant of good faith and fair dealing. In other words, because § 5(b) is an "unambiguously worded contractual provision[] designed to protect [a] contracting part[y]," the Court cannot "read [an] implied limitation[]" into its terms. *Moran*, 901 N.E.2d at 190.[14]

Although neither party cites *Moran* or the district court cases interpreting *Moran*, OPIC relies on the Second Circuit's opinion in *State Street Bank*, which it contends "involves a similar factual pattern as the case at bar." Pl.'s S.J. Mem. at 8; *see also* Pl.'s Opp. Mem. at 11; Pl.'s Rep. Mem. at 5. In *State Street Bank*, a defaulting debtor sought to sell some of its assets, which by contract first required the creditor's consent. *See* 374 F.3d at 168–69. The creditor refused consent unless it was paid a certain portion of the sale proceeds and the debtor agreed to provide the creditor with additional collateral to which the creditor was not otherwise entitled. *See id.* at 169. After the potential buyer indicated that it would not proceed with the sale, the debtor argued that the creditor's restrictions violated the implied covenant. *See id.* The Second Circuit observed,

---

[14] This conclusion is not in tension with the Court's prior determination that Gerwe "could potentially have a viable defense" based on the implied covenant "if OPIC unreasonably withheld consent to a restructuring" of Bressar. Dkt. 48 at 26. When the Court ruled on OPIC's first motion for summary judgment and Gerwe's motion to continue, neither the SPA as a whole nor the specific language of § 5(b) was available to the Court. *See id.* Because the SPA was not in the record at that time, the Court could not interpret its specific language in analyzing Gerwe's implied covenant defense, as both *Moran* and *State Street Bank* instruct courts to do.

however, that the contract at issue included "no express restrictions . . . that limit [the creditor's] right to refuse to consent" and concluded that, "[a]ccordingly, [the creditor] had the right under the [contract] to 'withhold consent for any reason or no reason.'" *Id.* at 170 (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters.*, 833 F. Supp. 344, 349 (S.D.N.Y. 1993)).

Gerwe argues that because the debtor in *State Street Bank* refused terms that would have guaranteed the creditor only a portion of the outstanding debt whereas Gerwe sought to sell Star Networks at a price that would have repaid OPIC entirely, *State Street Bank* is "factually inapposite" and "irrelevant to the instant case." Def.'s Rep. Mem. at 4–5. The Court disagrees. The *State Street Bank* court noted in *dicta* that the "proceeds fell far short of satisfying the . . . outstanding accelerated debt" only as support for its observation that "even if [the] implied covenant [applied] . . . , the [creditor's] refusal to consent to such a sale was neither unreasonable nor arbitrary." 374 F.3d at 170. Nothing in *State Street Bank* suggests that the portion of the debt to be repaid from the proposed sale affected the court's interpretation of the contract at issue or its holding based on the contract that the creditor could "withhold consent for any reason or no reason." *Id.* (quoting *Teachers Ins. & Annuity Ass'n*, 833 F. Supp. at 349).

Because the unambiguous language of the SPA does not limit OPIC's discretion or restrict the circumstances in which it may exercise such discretion, Gerwe's implied covenant claim fails as a matter of law and OPIC is entitled to summary judgment.

## B.    Whether OPIC Acted Arbitrarily or Irrationally

In any event, the record establishes that OPIC did not act arbitrarily or irrationally.

Gerwe argues that OPIC acted in bad faith in failing to "approv[e] his request for consent to the shareholder restructure so that he could sell [Star Networks] in order to achieve the common purpose [between the parties] – retirement of the [Star Networks] debt." Def.'s S.J. Mem. at 12.

16

According to Gerwe, "OPIC prevented [him] from arranging for the retirement" of Star Networks' debt to OPIC and therefore arbitrarily or irrationally chose to sue him for his partial guaranty of Star Networks' debt instead of ensuring that the entire debt could be repaid. *Id.* at 14. In addition to his claim that OPIC prevented him from repaying the full amount of Star Networks' debt, Gerwe argues that OPIC's irrational behavior includes: (1) OPIC's "disregard[ for] the minimal cost of the proposed shareholder restructure"; (2) OPIC's "refus[al] to consider [Gerwe's] valuation of [Star Networks]" and failure to "get its own valuation"; and (3) OPIC's attempt to "conceal[] its decision to institute litigation against" Gerwe and file suit "while a meeting with OPIC, [Gerwe,] and MTS was scheduled." *Id.* at 12–13.

Gerwe also argues that "OPIC was motivated by *actual* bad-faith [*sic*] and malice." *Id.* at 13. To support this claim, Gerwe points to Ms. Moronese's deposition testimony that Gerwe was a "spoiled child" during her first phone call with Gerwe after joining the OPIC project team handling the Star Networks loan. *See id.* at 13 (quoting Rader S.J. Decl. Ex. N at 38). At oral argument, Gerwe's counsel conceded that Ms. Moronese's deposition testimony is the only evidence in the record suggesting any animus on the part of anyone at OPIC. *See* Oral Arg. Tr. 13–14.

OPIC, by contrast, contends that "there is no evidence that [Gerwe] ever submitted an actual bona fide offer which would have triggered a formal review and consent," let alone evidence establishing that OPIC unjustifiably prevented a sale of Star Networks. Pl.'s S.J. Mem. at 8. OPIC contends that it agreed with Gerwe that Star Networks should be sold, but was skeptical that a sale would occur after approximately two years' worth of multiple failed attempts. OPIC therefore requested "a definitive, signed purchase agreement or memorandum of understanding . . . in order . . . to conduct a formal review and take appropriate action." *Id.* at 9. OPIC defends its decision

17

not to consent to Gerwe's proposed shareholder restructure—which Gerwe contends was necessary to obtain a bona fide offer from MTS—because "it violated accepted commercial standards by proposing payments to shareholders prior to the payment of debt." *Id.*

No reasonable juror could agree with Gerwe. The email correspondence between OPIC officials and Gerwe in the summer of 2012 make clear that OPIC would consider only a bona fide offer from MTS to purchase Star Networks. *See* Rader S.J. Decl. Exs. G, H. Gerwe does not dispute that OPIC made "numerous requests for details of the proposed sale," Smith S.J. Decl. ¶ 27, but there is no record evidence establishing that Gerwe provided those details to OPIC or that MTS ever formally offered to purchase Star Networks. Indeed, the only contemporaneous evidence suggesting MTS was interested in Star Networks is Gerwe's emails to OPIC officials. *See* Rader S.J. Decl. Exs. G, H. In light of Gerwe's other failed attempts to sell Star Networks to retire the company's debt, no reasonable juror could find that OPIC's demand to see other evidence of an offer was unreasonable. In the absence of evidence of such an offer, OPIC was not irrational for choosing to sue Gerwe for partial repayment instead of allowing him to continue to pursue possible ways for Star Networks to repay OPIC in full.

Gerwe's additional arguments are also unpersuasive. Gerwe contends, for example, that OPIC ignored the minimal cost of his proposed shareholder restructure. *See* Def.'s S.J. Mem. at 12–13. Gerwe bases this argument on the fact that OPIC ultimately notified him in July 2012 that it would consider his shareholder restructuring plan only after he (1) satisfied his $5 million guaranty and (2) did so before paying Bressar's minority shareholders. *See* Rader S.J. Decl. Ex. H; *see also* Defs.' S.J. Mem. at 7–8. Rather than paying OPIC directly, however, Gerwe wanted to invest $5 million into Star Networks and use it to pay part of the company's debt to OPIC. *See* Rader S.J. Decl. Ex. H. That way, Gerwe said he could recoup the money after he sold Star

Networks to MTS and Star Networks paid off the rest of its debt. *See id.* According to Gerwe, he could not put his plan into motion unless and until the minority shareholders (whom Gerwe said would reject his attempt to loan Star Networks $5 million) were first bought out. *See id.* OPIC nonetheless demanded "to be paid out first." *Id.*

OPIC's position was neither arbitrary nor irrational. It is not unusual for a creditor to consent to a debtor's proposal only with conditions favorable to the creditor, and demanding such conditions does not normally trigger a claim for breach of the implied covenant. *See, e.g., State Street Bank*, 374 F.3d at 170–71 (holding that a bank did not act arbitrarily or irrationally when conditioning its consent to a debtor's asset sale "on the receipt of additional collateral and economic benefits to which the bank was not entitled under the [contract]"); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526–27 (2d Cir. 1994) (holding that when creditor "had no obligation to grant [debtor] an extension of time so he could cure his default[,] . . . there was nothing improper in [creditor's] demand for release from other obligations in exchange for granting [debtor] an extension of time to remit payment"). Here, OPIC was not obligated to negotiate with Gerwe before enforcing his guaranty, but did so nonetheless. Over the course of approximately two years before Gerwe's request to buy out Bressar's minority shareholders, OPIC had already been informed about three unsuccessful plans to sell Star Networks or merge it with another company. In light of these facts, no reasonable juror could find that OPIC acted unreasonably in seeking to ensure that Gerwe paid his guaranty to OPIC before paying any money to Bressar's minority shareholders, no matter how small a sum the buyout would cost when compared to Star Networks' debt.

Gerwe also argues that OPIC was irrational for refusing to consider his valuation of Star Networks and being misleading about its intent to sue him. *See* Def.'s S.J. Mem. at 12–13. Even

if OPIC chose not to consider Gerwe's one-page valuation of Star Networks or obtain its own valuation, however, it was under no obligation to do so. Moreover, OPIC's decision to pursue litigation at the same time it sought to meet with Gerwe and MTS must be viewed in the context of Gerwe's prior failures to sell Star Networks and OPIC's belief that a sale to MTS was unlikely to occur. OPIC's decision to pursue litigation and negotiation simultaneously was therefore neither arbitrary nor irrational as a matter of law.

Finally, the Court disagrees with Gerwe that OPIC nonetheless acted with actual malice. Gerwe concedes that the only evidence in the record suggesting malice is Ms. Moronese's deposition testimony that Gerwe "acted like a spoiled child" during a phone conversation. *See* Oral Arg. Tr. 13–14. Ms. Moronese went on to testify, however, that by that comment she meant that Gerwe was "frustrated on the phone and became angry." Rader S.J. Decl. Ex. N at 38. When viewed in context, Ms. Moronese's stray comment alone does not establish animus or create a factual dispute to be resolved at trial. *See Flamingo LLC v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, No. 11-CV-4862 (CM), 2013 WL 416050, at *5 (S.D.N.Y. Feb. 4, 2013) (holding that a "single statement" in a deposition that was not a "plain statement" was not "sufficient to raise an issue of fact requiring trial").

In sum, no reasonable juror could find that OPIC acted arbitrarily or irrationally in refusing to consent to Gerwe's request to buy out Bressar's minority shareholders so as to facilitate MTS' potential purchase of Star Networks. OPIC spent months working with Gerwe and encouraging him to submit a formal offer from MTS before it initiated this action. OPIC did so, moreover, after there had been three attempts to sell Star Networks or transfer its ownership over approximately two years, and that all three attempts failed. At the time OPIC refused its consent, Star Networks had been in default for approximately six months, during which time Gerwe had

not fulfilled his guaranty obligations.  In light of these facts, OPIC acted reasonably in demanding that it receive payment on Gerwe's guaranty *before* Gerwe paid money to Bressar's minority shareholders to pursue a deal with MTS.  Gerwe's defense based on the implied covenant of good faith and fair dealing therefore fails.

## CONCLUSION

For the foregoing reasons, OPIC's motion for summary judgment is granted and Gerwe's motion for summary judgment is denied.  The Clerk of Court is respectfully directed to terminate items 85 and 89 on the docket.  By no later than March 30, 2016, the parties shall submit a joint proposed judgment to the Court.

SO ORDERED.

Dated:      March 28, 2016
            New York, New York

Ronnie Abrams
United States District Judge